

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

FILED
IN OPEN COURT

AUG - 7 2014

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal No. 1:14-CR-277 |
| v. | Count 1: 18 U.S.C. § 371– Conspiracy |
| JAMES EDWARD QUINN, WORLD MEDICAL LIMITED, and ATLANTIC PHARMACEUTICALS AG, | Count 2: 18 U.S.C. § 545 – Importation Contrary to Law |
| Defendants. | Counts 3-4: 21 U.S.C § 331(a) – Introduction of Misbranded Drugs |
| | Counts 5-6: 21 U.S.C § 331(a) – Introduction of Misbranded Drugs |
| | Count 7: 21 U.S.C. § 331(t) – Unlicensed Wholesale Distribution of Prescription Drugs |
| | Notice of Forfeiture |

## INDICTMENT

### AUGUST 2014 TERM - at Alexandria, Virginia

THE GRAND JURY CHARGES THAT:

### GENERAL ALLEGATIONS

At all times relevant to this Indictment:

1.      The Food and Drug Administration ("FDA") was the agency of the United States responsible for regulating the manufacture, labeling, and distribution of drugs in the United States. Among other things, the FDA was responsible for enforcing the provisions of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.* ("FDCA"), including regulating the wholesale distribution of prescription drugs.

2.      A "drug" was defined by the FDCA as, among other things, any article intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other

1

animals; articles (other than food) intended to affect the structure or any function of the body of man or other animals; and articles intended for use as a component of any such articles. *See* 21 U.S.C. § 321(g).

3.      A prescription drug was defined by the FDCA as "a drug intended for use by man which because of its toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, is not safe except under the supervision of a practitioner licensed by law to administer such drug." 21 U.S.C. § 353(b)(1)(A).  A drug may also be limited to prescription use by its FDA-approved application. *See* 21 U.S.C. § 353(b)(1)(B).

4.      The distribution of prescription drugs in the United States was regulated by the FDA and was subject to a series of strict controls.  To prevent prescription drug diversion and the introduction of counterfeit, stolen, or substandard drugs into interstate commerce, Congress enacted the Prescription Drug Marketing Act ("PDMA"), which it incorporated into the FDCA.

5.      Under the PDMA, no person could engage in the wholesale distribution in interstate commerce of prescription drugs in a State unless such person was licensed by the State. *See* 21 U.S.C. §§ 353(e)(2)(A).  FDA regulations set forth the minimum standards, terms, and conditions for the state licensing of wholesale prescription drug distributors, including guidelines for the storage and handling of such drugs and for the establishment and maintenance of records regarding the distributions of such drugs. *See* 21 U.S.C. § 353(e)(2)(B); 21 C.F.R. §§ 205.5, 205.50, 206.6.  The regulations further provided that wholesale prescription drug distributors were required to permit State licensing authorities and authorized Federal, State, and local law enforcement officials to enter and inspect their premises and delivery vehicles, and to audit their records and written operating procedures. 21 C.F.R. § 205.50(i).

2

6.    The PDMA also required that each person engaged in the wholesale distribution of prescription drugs who is not the manufacturer or authorized distributor of record of such drug shall have provided to the person who receives the drug, before each wholesale distribution, a statement identifying each prior sale, purchase, or trade of such drug (including the date of the transaction and the names and addresses of all parties to the transaction). *See* 21 U.S.C. § 353(e)(1)(A). This is known as the "pedigree" requirement.

7.    Before a new drug could be introduced into interstate commerce, it must have been the subject of an approved application filed with the FDA. *See* 21 U.S.C. § 331(d), 355(a). FDA approval was not for the molecular entity itself (i.e. the active ingredient) but included the labeling. *See* 21 C.F.R. § 314.50(i).

8.    The FDCA prohibited the introduction, and delivery for introduction, into interstate commerce of any drug that was misbranded. *See* 21 U.S.C. § 331(a).

9.    A drug was misbranded if, among other things, its labeling lacked adequate directions for use. *See* 21 U.S.C. § 352(f)(1). By regulation, the FDA defined "adequate directions for use" to mean directions "under which the *layman* can use a drug safely and for the purpose for which it is intended." 21 C.F.R. § 201.5 (emphasis added). Prescription drugs could never contain adequate directions for lay use and were therefore misbranded unless they qualified for an exemption. A prescription drug was exempt from Section 352(f)(1) if (1) the drug was in the possession of a person regularly and lawfully engaged in the manufacture, transportation, storage, or wholesale distribution of prescription drugs; and (2) the labeling on or within the package from which the drug was to be dispensed bore the statement "Rx Only" and was the labeling authorized by the FDA-approved new drug application. *See* 21 C.F.R. §§ 201.100 (a)(1)(i), (b)(1), (c)(2).

3

10.     A drug was adulterated if, among other things, "the facilities or controls used for . . . its processing, packing, or holding [did] not conform to or [were] not operated or administered in conformity with current good manufacturing practice" to assure that the drug meets FDA requirements for safety and has the correct identity, strength, quality, and purity. *See* 21 U.S.C § 351(a)(2)(B).

11.     The United States Customs and Border Protection ("CBP"), and Immigration and Customs Enforcement, Homeland Security Investigations ("ICE-HSI"), two agencies within the United States Department of Homeland Security ("DHS"), were the federal agencies responsible for administering and enforcing violations of the laws governing the importation into the United States of goods and merchandise, including drugs.

## THE DEFENDANTS

12.     Defendant JAMES EDWARD QUINN, a citizen of Australia and a resident of the United Kingdom, was a principal and director of Defendants WORLD MEDICAL LIMITED and ATLANTIC PHARMACEUTICALS AG, through which he trans-shipped and supplied misbranded and adulterated prescription drugs to co-conspirators in the United States.

13.     Defendant WORLD MEDICAL LIMITED ("WORLD MEDICAL") was a United Kingdom limited company with its principal place of business in Farnham, Surrey, United Kingdom. WORLD MEDICAL was registered on or about May 31, 2002, and was engaged in the trans-shipping of misbranded and adulterated drugs through the United Kingdom to the United States.

14.     Defendant ATLANTIC PHARMACEUTICALS AG ("ATLANTIC PHARMA") was a Swiss corporation with its principal place of business in the United Kingdom. ATLANTIC PHARMA was incorporated on or about October 2, 2005, and was engaged in the

4

sale and trans-shipping of misbranded and adulterated drugs through the United Kingdom to the United States.

16. Many of the drugs sold and trans-shipped by the Defendants were subject to a FDA "black box" warning. This warning is the most serious type of warning imposed by FDA, and signifies that medical studies indicate that the drug carries a significant risk of serious and life-threatening adverse effects.

16. Many of the drugs sold and trans-shipped by the Defendants were cold-chain drugs subject to strict temperature controls in order to preserve drug efficacy and protect patient health and safety.

17. The drugs sold and trans-shipped by the Defendants were not approved by the FDA for distribution or sale in the United States.

18. Co-conspirators, including GALLANT PHARMA INTERNATIONAL INC. ("GALLANT PHARMA"), which was based in the Eastern District of Virginia, used QUINN as a trans-shipper through WORLD MEDICAL. These co-conspirators would acquire misbranded and adulterated drugs from international suppliers, including in Turkey, Switzerland, and the United Arab Emirates, and would arrange for those suppliers to send the drugs to WORLD MEDICAL in the United Kingdom.

19. Other co-conspirators, including PHARMALOGICAL INC., d/b/a MEDICAL DEVICE KING, which was based in the Eastern District of New York, purchased misbranded and adulterated drugs from QUINN via ATLANTIC PHARMA. ATLANTIC PHARMA would then ship the drugs to WORLD MEDICAL in the United Kingdom, which would trans-ship the drugs to the United States.

5

20.    QUINN and WORLD MEDICAL, as trans-shippers, would break large packages of drugs arriving in the United Kingdom from elsewhere in the world into multiple smaller packages before sending the packages to co-conspirators in the United States. QUINN and unindicted co-conspirators who served as WORLD MEDICAL employees would affix to the packages false Customs declarations that would include misleading information about the shipment, including an understated dollar value or a deceptive description of package contents. Often, ten or more small packages would be sent to the same United States recipient on the same day.

21.    QUINN was aware that, once co-conspirators in the United States received packages from World Medical, the co-conspirators would then further ship or present the drugs to customers located throughout the United States.

22.    QUINN requested co-conspirators selling drugs in the United States to provide him with the medical license of a licensed physician. For example, QUINN recorded co-conspirator ANOUSHIRVAN SARRAF, the owner and operator of APHRODITE ADVANCED ESTHETIC & SKIN CARE CLINIC ("APHRODITE"), in McLean, Virginia, in the Eastern District of Virginia, as the customer on all shipments intended for GALLANT PHARMA, which was an unlicensed wholesale prescription drug distributor.

23.    During the time period of the conspiracy, the Defendants illegally imported at least the following misbranded and adulterated drugs into the United States:

| Product | Use |
|---|---|
| Alimta | Injectable chemotherapy for lung cancer. |
| Avastin | Intravenous chemotherapy for colon cancer, lung, kidney, and brain cancer, subject to FDA "black box" warning. Cold-chain product. |
| Botox | Injectable treatment for forehead wrinkles and eye muscle disorders, subject to FDA "black box" warning. Cold-chain product. |
| Diprivan / Propofol | Intravenous sedative, subject to FDA "black box" warning. |

6

| Dysport | Injectable treatment for forehead wrinkles and abnormal head position/n subject to FDA "black box" warning.  Cold-chain product. |
| Eloxatin | Intravenous chemotherapy for colon cancer, subject to FDA "black box" warning. |
| Erbitux | Intravenous chemotherapy for colorectal, head, and neck cancers, subject to FDA "black box" warning. |
| Faslodex | Injectable treatment for postmenopausal breast cancer. |
| Herceptin | Intravenous chemotherapy for breast cancer, subject to FDA "black box" warning. |
| Neupogen | Injectable treatment to reduce infections associated with reduced blood cells and platelets (a side effect of chemotherapy).  Cold-chain product. |
| Paclitaxel | Intravenous chemotherapy for lung, ovary, and breast cancer, subject to FDA "black box" warning.  Cold-chain product. |
| Rituxan | Injectable chemotherapy for non-Hodgkin's lymphoma, subject to FDA "black box" warning.  Cold-chain product. |
| Taxotere | Intravenous chemotherapy for lung and breast cancer, subject to FDA "black box warning.  Cold-chain product. |
| Velcade | Intravenous chemotherapy for multiple myeloma patients who have already had several unsuccessful courses of treatment. |
| Zometa | Injectable treatment for bone tumors and hypercalcemia. |

24.   The above factual allegations are re-alleged and incorporated into each Count of this Indictment as if fully set forth in each Count.

## COUNT 1

### (18 U.S.C. § 371 – Conspiracy)

THE GRAND JURY CHARGES THAT:

25.     Beginning in at least May 2010, and continuing until at least July 2014, in the Eastern District of Virginia and elsewhere, the defendants,

**JAMES EDWARD QUINN,**

**WORLD MEDICAL LIMITED, and**

**ATLANTIC PHARMACEUTICALS AG,**

did knowingly and intentionally combine, conspire, confederate, and agree, with each other and with other persons known and unknown to the Grand Jury, to:

(a) fraudulently and knowingly import and bring into the United States merchandise contrary to law, in violation of Title 18, United States Code, Section 545;

(b) knowingly engage in the wholesale distribution in interstate commerce of prescription drugs in the Commonwealth of Virginia without being licensed by the Commonwealth of Virginia to do so, in violation of Title 21, United States Code, Sections 331(t), 333(b)(1)(D), and 353(e)(2)(A);

(c) with the intent to defraud and mislead, introduce into interstate commerce misbranded and adulterated drugs in violation of Title 21, United States Code, Sections 331(a) and 333(a)(2); and

(d) defraud the United States and its agencies by: impeding, impairing, and defeating the lawful functions of the FDA to protect the health and safety of the public by ensuring that drugs distributed in the United States were safe and effective from the time of manufacturing to the delivery to the entity that sells or dispenses the product to the ultimate consumer or patient; and

impeding, impairing, and defeating the lawful functions of CBP and ICE-HSI to protect the public health and safety by governing the importation into the United States of goods and merchandise, including drugs.

*Ways, Manner, and Means of the Conspiracy*

In furtherance of the conspiracy, the Defendants and others known and unknown to the Grand Jury employed, among others, the following manner and means:

26.   It was part of the conspiracy that members of the conspiracy would purchase drugs intended for use in foreign countries from foreign suppliers, including ATLANTIC PHARMA.

27.   It was further part of the conspiracy that foreign suppliers would ship the drugs to QUINN and WORLD MEDICAL in the United Kingdom.

28.   It was further part of the conspiracy that QUINN and WORLD MEDICAL would ship drugs intended for co-conspirators in the United States by Royal Mail. This method of shipment, and transshipment, furthered the conspiracy because it allowed packages to be delivered through the USPS with less scrutiny than would be applied to packages arriving from other countries.

29.   It was further part of the conspiracy that QUINN and WORLD MEDICAL employees would break packages intended for co-conspirators in the United States into multiple smaller shipments, or include misleading statements about the package contents and value, or send packages addressed to a recipient other than the corporate co-conspirator. These actions furthered the conspiracy by misleading CBP and therefore causing CBP to apply lessened scrutiny to the packages.

30.    It was further part of the conspiracy that co-conspirators in the United States caused the misbranded and adulterated drugs sold and shipped by the Defendants to travel in interstate commerce from the Eastern District of Virginia and elsewhere to doctors, medical practices, and hospitals across the United States.

31.    It was further part of the conspiracy that members of the conspiracy regularly communicated with each other via e-mail about the acquisition, illegal importation, and sale of misbranded and adulterated drugs.

32.    It was further part of the conspiracy that the Defendants derived a direct financial benefit from the illegal importation and sale of misbranded and adulterated drugs in the United States.

*Overt Acts*

33.    It was further part of the conspiracy that the following acts in furtherance of and to effect the objects of the above-described conspiracy were committed in the Eastern District of Virginia and elsewhere:

a.    On or about September 24, 2011, QUINN e-mailed TALIB KHAN, one of the owners and operators of co-conspirator GALLANT PHARMA, to provide notification that a shipment of misbranded and adulterated drugs would be sent the following morning.

b.    On or about December 8, 2011, QUINN e-mailed KHAN regarding Botox intended for Turkey.

c.    On or about February 22, 2012, QUINN e-mailed KHAN to inquire about an incoming shipment of Avastin from India.  QUINN warned KHAN about two companies selling Avastin into the United States and advised him to "be very careful."  QUINN further advised KHAN to obtain additional information via Google.

10

d.    On or about February 26, 2012, QUINN e-mailed a co-conspirator employed by WORLD MEDICAL and stated that KHAN "should not have any US identity or hold ANY inventory there." QUINN suggested that WORLD MEDICAL handle all aspects of distribution and inventory storage, and KHAN continue to market "and generate sales in the name of Gallant Pharma." QUINN further stated that "we work with him to do the same for his oncology sales . . . supplied by [a co-conspirator in Switzerland] and we ship to his clients."

e.    On or about April 14, 2012, QUINN spoke by telephone with co-conspirator EVA MONTEJO PRITCHARD, girlfriend of co-conspirator SARRAF and the office manager of APHRODITE, in the Eastern District of Virginia.

f.    On or about April 14, 2012, QUINN e-mailed PRITCHARD in the Eastern District of Virginia. In the e-mail, QUINN described WORLD MEDICAL as a company that "primarily imports Medical Products and Pharmaceuticals into the UK and exports them to the USA and other countries." QUINN discussed establishing PRITCHARD as an "Official Agent for Atlantic Pharmaceuticals AG" but cautioned that "we need to observe high security, so I would encourage you to only discuss the proposal verbally and to not write it in any emails." Although Botox is a cold-chain drug, in the same e-mail, QUINN told PRITCHARD that "we do not really have to use the Cold Chain boxes when we ship the products to you."

g.    On or about April 19, 2012, QUINN e-mailed PRITCHARD in the Eastern District of Virginia. In the e-mail, QUINN proposed a packing and shipping arrangement wherein he would ship 20 units of non-FDA-approved Botox to APHRODITE at a time, in "small plastic bags, which are placed in Styrofoam Boxes . . . about 12" x 12" x 12" with plastic padding inside to protect the contents." QUINN asked PRITCHARD to remit payment through "our Swiss Credit Card Payment System through SixPay."

11

h.   On or about May 30, 2012, co-conspirators at GALLANT PHARMA shipped ten units of misbranded Erbitux and six units of misbranded Rituxan (Mabthera), that had been received from QUINN and WORLD MEDICAL, from the Eastern District of Virginia to Dr. M.M. in Fort Worth, Texas, in exchange for $15,920.00.

i.   On or about July 31, 2012, co-conspirators at GALLANT PHARMA shipped two units of misbranded Herceptin, five units of misbranded Altima, and ten units of misbranded Eloxatin, that had been received from QUINN and WORLD MEDICAL, from the Eastern District of Virginia to Dr. J.C. in Houston, Texas, in exchange for $29,190.00.

j.   On or about August 10, 2012, ten (10) packages intended for GALLANT PHARMA and addressed to SARRAF at APHRODITE arrived at APHRODITE from the United Kingdom.  The packages were sent by QUINN and WORLD MEDICAL via Royal Mail and were delivered by the USPS.  The shipping documents indicated that the packages contained "medical instruments" with a declared value of 500GBP.  In actuality, the packages contained misbranded and adulterated drugs and devices worth more than more than $120,000, including 120 vials of Zometa and 25 vials of Dysport.

k.   On or about July 10, 2014, QUINN and WORLD MEDICAL shipped twenty (20) units of non-FDA-approved Radiesse to a co-conspirator in Colorado, in a package bearing false information as to the package's value and contents, and marked as package "2 of 5".

(All in violation of Title 18, United States Code, Section 371).

**COUNT 2**

(18 U.S.C. § 545 – Importation Contrary to Law)

THE GRAND JURY FURTHER CHARGES THAT:

34.    The factual allegations contained in Paragraphs 25 through 32 are re-alleged and incorporated as if set forth here in their entirety.

35.    From at least May 2010 through in or about July 2014, in the Eastern District of Virginia and elsewhere, defendants

**JAMES EDWARD QUINN,**

**WORLD MEDICAL LIMITED, and**

**ATLANTIC PHARMACEUTICALS AG,**

did fraudulently and knowingly import and bring into the United States merchandise contrary to law, in that the merchandise was: misbranded and adulterated drugs, in violation of 21 U.S.C. §§ 331(a) and 333(a)(2); and imported by means of a fraudulent and false invoice, declaration, affidavit, letter, paper, and by means of a false statement, written or verbal, and by means of a false and fraudulent practice and appliance, and by means of a false statement in a declaration without reasonable cause to believe the truth of such statement, and by means of a false statement procured as to a material matter material without reasonable cause to believe the truth of such statement, in violation of 18 U.S.C. § 542.

(All in violation of Title 18, United States Code, Section 545).

## COUNTS 3-4

(21 U.S.C. § 331(a) and 333(a)(2) – Introducing Misbranded Drugs Into Interstate Commerce)

THE GRAND JURY FURTHER CHARGES THAT:

36.     The factual allegations contained in Paragraphs 25 through 32 are re-alleged and incorporated as if set forth here in their entirety.

37.     On or about the dates listed below, in the Eastern District of Virginia and elsewhere, defendants

**JAMES EDWARD QUINN,**

**WORLD MEDICAL LIMITED, and**

**ATLANTIC PHARMACEUTICALS AG,**

with the intent to defraud and mislead, introduced, delivered for introduction, and caused and aided and abetted the introduction and delivery for introduction into interstate commerce, from the Eastern District of Virginia to the locations listed below, the indicated drugs that were misbranded as defined in Title 21, United States Code, Section 352(f)(1), in that the labeling did not bear adequate directions for use.

| Count | Approximate Date | Description of Introduction |
|-------|------------------|------------------------------|
| 3 | May 30, 2012 | Shipment of ten units of misbranded Erbitux and six units of misbranded Rituxan (Mabthera) from GALLANT PHARMA to Dr. M.M. in Fort Worth, Texas, in exchange for $15,920.00. |
| 4 | July 31, 2012 | Shipment of two units of misbranded Herceptin, five units of misbranded Altima, and ten units of misbranded Eloxatin from GALLANT PHARMA to Dr. J.C. in Houston, Texas, in exchange for $29,190.00. |

(All in violation of Title 21, United States Code, Sections 331(a) and 333(a)(2), and Title 18, United States Code, Section 2).

14

## COUNTS 5-6

(21 U.S.C. § 331(a) and 333(a)(1) – Introducing Misbranded Drugs Into Interstate Commerce)

THE GRAND JURY FURTHER CHARGES THAT:

38.     The factual allegations contained in Paragraphs 25 through 32 are re-alleged and incorporated as if set forth here in their entirety.

39.     On or about the dates listed below, in the Eastern District of Virginia and elsewhere, defendants

**JAMES EDWARD QUINN,**

**WORLD MEDICAL LIMITED, and**

**ATLANTIC PHARMACEUTICALS AG,**

introduced, delivered for introduction, and caused and aided and abetted the introduction and delivery for introduction into interstate commerce, from the Eastern District of Virginia to the locations listed below, the indicated drugs that were misbranded as defined in Title 21, United States Code, Section 352(f)(1), in that the labeling did not bear adequate directions for use.

| Count | Approximate Date | Description of Introduction |
|-------|------------------|------------------------------|
| 5 | May 30, 2012 | Shipment of ten units of misbranded Erbitux and six units of misbranded Rituxan (Mabthera) from GALLANT PHARMA to Dr. M.M. in Fort Worth, Texas, in exchange for $15,920.00. |
| 6 | July 31, 2012 | Shipment of two units of misbranded Herceptin, five units of misbranded Altima, and ten units of misbranded Eloxatin from GALLANT PHARMA to Dr. J.C. in Houston, Texas, in exchange for $29,190.00. |

(All in violation of Title 21, United States Code, Sections 331(a) and 333(a)(1), and Title 18, United States Code, Section 2).

15

<u>**COUNT 7**</u>

(21 U.S.C. § 331(t) – Unlicensed Wholesale Distribution of Prescription Drugs)

THE GRAND JURY FURTHER CHARGES THAT:

40.     The factual allegations contained in Paragraphs 25 through 32 are re-alleged and incorporated as if set forth here in their entirety.

41.     Between August 2011 and August 2012, in the Eastern District of Virginia, defendants

**JAMES EDWARD QUINN,**

**WORLD MEDICAL LIMITED, and**

**ATLANTIC PHARMACEUTICALS AG,**

did knowingly aid and abet the wholesale distribution in interstate commerce of prescription drugs without a license in the Commonwealth of Virginia; specifically, Defendants sent intravenous chemotherapy prescription drugs from the United Kingdom to SARRAF in the Commonwealth of Virginia, knowing that the drugs were intended for unlicensed wholesale distributor GALLANT PHARMA.

(All in violation of Title 21, United States Code, Sections 331(t), 333(b)(1)(D), 353(e)(2)(A), and 353(e)(3)(B) and Title 18, United States Code, Section 2).

16

### NOTICE OF FORFEITURE

### (18 U.S.C. § 981(a)(2)(B); 18 U.S.C. § 982(b)(1); 28 U.S.C. § 2461(c))

1.     The allegations contained in Counts 1 and 2 of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeiture.

2.     Pursuant to Federal Rule of Criminal Procedure 32.2(a), the United States of America gives notice to the defendants that, in the event of a conviction of any of the offenses charged in Counts 1 and 2 of this Indictment, the United States intends to forfeit the property further described in this NOTICE OF FORFEITURE.

3.     A defendant who is convicted of an offense in violation of 18 U.S.C. § 545, or a conspiracy to violate 18 U.S.C. § 545, shall forfeit to the United States of America, pursuant to 18 U.S.C. § 981(a)(2)(B) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to such violation(s).

4.     The property to be forfeited includes, but is not limited to, the following:

    a.     At least one million dollars in United States currency;

    b.     6-7 Riverside Park, Dogflud Way, Farnham, Surrey GU9 7UG, United Kingdom;

    c.     2004 Bentley Continental GT Coupe, Registration F1WMG, Insurance Certificate #A009220010267617;

    d.     PostFinance AG (Switzerland) account number 000912784889, held in the name of Atlantic Pharma (IBAN: CH2709000000912784889);

    e.     Barclays Bank PLC account number 46498655, held in the name of World Medical Group (IBAN: GB67BARC20169946498655); and

    f.     Barclays Bank PLC account number 20736112, held in the name of World Medical Group (IBAN: GB79BARC20169920736112).

5.     If any of the property described above, as a result of any act or omission of any defendant,

17

a.  cannot be located upon the exercise of due diligence;

b.  has been transferred or sold to, or deposited with, a third party;

c.  has been placed beyond the jurisdiction of the court;

d.  has been substantially diminished in value; or

e.  has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title

21, United States Code, Section 853(p), as incorporated by Title 18, United States Code,

Sections 982(b)(1) and Title 28, United States Code, Section 2461(c).

(All pursuant to 18 U.S.C. § 981(a)(2)(B) and § 982(b)(1), and 28 U.S.C. § 2461(c))


DANA J. BOENTE
UNITED STATES ATTORNEY

A TRUE BILL:

Pursuant to the E-Government Act,
the original of this page has been filed
under seal in the Clerk's Office.

_____
LINDSAY A. KELLY
MAYA D. SONG
ASSISTANT UNITED STATES ATTORNEYS

_____
Foreperson of the Grand Jury

18